## BROOKS v. PRATT.

## SAME v. GRAY et al.

### (Circuit Court of Appeals, First Circuit. June 18, 1902.)

### Nos. 399, 400.

**1. INSANE PERSONS—EVIDENCE.**

Two brothers, who were dependent on their uncles, were sent to an insane asylum during their young manhood, where their uncles supported them. They had remained there for nearly 50 years without objection at the time they executed certain assignments, and the superintendent of the asylum and two of his assistants testified that they were insane. They were permitted by the asylum authorities to have their freedom, and they were given an allowance with which to buy articles they required, part of which they deposited in a savings bank account. A diary kept by one of them, when taken as a whole, also indicated insanity; but a reputable physician, who was an expert on insanity, testified that, after a conversation with one of them, lasting 45 minutes, he did not discover insanity. *Held*, that a finding that the brothers were insane at the time they executed the assignments was justified.

**2. SAME—ASSIGNMENT TO ATTORNEY—VALIDITY.**

Where an attorney at law, who was a relative of two incompetents, obtained from them assignments of certain spoliation claims against the United States government, which he was prosecuting, and which he succeeded in collecting, without requiring the incompetents to act under independent advice, and in an action to set aside the assignment it appeared that one of the incompetents did not understand the meaning of the assignment, and defendant on several occasions had advised them not to mention it to their relatives, and in several of his letters to them had made incorrect statements, and did not testify frankly as to what had become of a prior assignment, a judgment vacating the assignment was proper.

Appeals from the Circuit Court of the United States for the District of Massachusetts.

The following is the opinion of the court below (LOWELL, District Judge):

These are two bills in equity, brought respectively by Charles R. Gray and Frederick W. Gray, to set aside two assignments made severally by them to the defendant William Gray Brooks. Charles has died since the filing of the original bill, and his administrator has filed a bill of revivor. The guardians duly appointed of the complainants above mentioned have joined in the bills. The assignment by Charles R. Gray was as follows:

"Know all men by these presents, that I, Charles Russell Gray, of Brattleboro, in the state of Vermont, do hereby assign, release, and relinquish unto my nephew, William Gray Brooks, counselor at law, of Boston, in the county of Suffolk, in the commonwealth of Massachusetts, all my right, title, and interest which at the date of these presents, or at any future time, I may have in and to any portion of any award now made, or at any future time to be made, by the government of the United States of America, under the acts of the congress of the same, to the 'next of kin' of William Gray, the elder of that name, by reason of indemnity for losses, depredations, seizures, captures, detentions, and spoliations suffered by William Gray, the elder, aforesaid, subject, nevertheless, to the conditions following:

"First. To have and to hold the property aforesaid in trust for my use and benefit during the continuance of my natural life, yielding and paying unto me the interest and income arising therefrom, and so much of the principal sum thereof as to make the payment to me equal to four and one-half per centum on the principal sum by these presents conveyed in each and every year during the continuance of my natural life, and such sums as

I may desire to withdraw from the principal sum aforesaid during my natural life.

"Second. Upon my decease the property aforesaid is to become the absolute property of William Gray Brooks aforesaid, free and discharged from any trust or condition whatsoever.

"In testimony whereof I, Charles Russell Gray, aforesaid, have hereunto set my hand and seal this seventh day of July, in the year of our Lord one thousand eight hundred and ninety-six.

"Charles Russell Gray.    [Seal.]"

The assignment by Frederick W. Gray was identical with the above.

The complainants seek to set aside the assignments because Charles and Frederick Gray were of unsound mind at the time of execution, and because they were induced to execute the assignments by the fraud of the defendant.

Charles and Frederick Gray were brothers. Charles was born in 1819, Frederick in 1823. In 1847, Frederick was admitted to the Vermont Asylum for the Insane, now called the "Brattleboro Retreat," where he has since resided. Charles was admitted to the same institution in January, 1848, and resided there until the time of his death, February 1, 1898.

The court has first to consider if these two persons, either or both, were of unsound mind July 7, 1896. In my opinion, they both were. Each of them had at that time been an inmate of an insane asylum for nearly fifty years. To that institution they had not then been committed by any form of law, perhaps because these forms were less scrupulously observed fifty years ago than at the present time, and the administration of insane asylums was then less carefully regulated by statute. It should be added that the brothers probably went to the asylum and remained in it without opposition on their part. William H. Brooks, father of the defendant, who married their sister, testified that they were sent to the insane asylum for two reasons: First, because the cost of board there was very small, and their father had lost all his property, so that the uncles had the care of the children; and, second, in order that they might have a place where they could permanently remain, instead of changing from place to place, as they might prefer. That these reasons were real, I see no reason to doubt, but that the primary and controlling reason was a mental weakness on the part of both Charles and Frederick .there can be no doubt whatsoever. Uncles do not send penniless nephews of average mental capacity, and in the prime of young manhood, to insane asylums, in order to save something in the price of board; and, if this be true of uncles in general, there is no reason to suppose that the most respectable uncles in this particular case acted in the very unusual manner suggested by Mr. W. H. Brooks. Moreover, ordinary young men, a little more than twenty years of age, do not passively retire to insane asylums for the rest of their natural lives, even if their uncles request them to go there.

In 1847 and 1848 Charles and Frederick Gray were doubtless deemed to be mentally weak, and proper inmates for an insane asylum. In the Vermont insane asylum or retreat they were permitted, as is the case with not a few insane patients in other asylums, a comparatively great degree of liberty. They had a key, by which they could let themselves in and out of the building. They went about the streets of Brattleboro freely. Each of them had an allowance of about fifteen dollars a month, with which they bought clothing and other articles as they pleased. They opened an account in the savings bank with their surplus allowance, and they made visits to their friends in Boston and elsewhere. They were allowed to correspond freely, and in ordinary conversation they doubtless passed for ordinary members of the community,—a condition which can always be predicated of a few inmates of an average insane asylum. That they were mentally unsound, however, is shown by conclusive evidence. In the first place, we have the records of the asylum, which I conceive to be admissible in evidence by virtue of the decision in Inhabitants of Townsend v. Inhabitants of Pepperell, 99 Mass. 40. See Donovan v. Railroad, 158 Mass. 450, 455, 33 N. E. 583. There is testimony to the same effect from the superintendent, from a present and from a former assistant. In the case of Frederick, there was introduced in evidence his diary for the years 1873, 1883, and 1892. In these

diaries there may be no entry, which, standing by itself, proclaims its writer insane, but it is probably true that almost any single written or spoken expression of a raving lunatic can be paralleled in some utterance of some man undoubtedly sane. It is not by a single expression that insanity is ordinarily to be detected. These diaries, both in respect of the language, the peculiar and unintelligible signs largely employed, and their general physical appearance, impress me with the strong belief that the writer was of unsound mind. To specify instances is unprofitable. The impression is derived from a general inspection of the whole of each diary.

The defendant has introduced in evidence the testimony of Dr. Hazelton, who, on one occasion since the execution of the instrument in question, spent forty-two minutes with Frederick Gray in the retreat, and during that time had with him considerable conversation. That conversation appeared rational to Dr. Hazelton, and to indicate that Frederick's mind was a little above the class of minds who have the same early education and the same slight contact with the world. In the conversation Dr. Hazelton discovered no evidence of mental incapacity. From his examination of the record of Charles R. Gray he reached substantially the same conclusion concerning him. Dr. Hazelton is an established physician of good standing, who was at the McLean Asylum from 1865 to 1867; had a license to maintain a private asylum in 1868, which he kept for a year and a half; went into general practice in 1869, and has since continued therein. For about seventeen years he has "been medical examiner for prisons; that is, I examine people who are suspected of mental trouble in all prisons or reformatories of this state." Whether Dr. Hazelton is the sole officer employed for this purpose does not appear, nor does the extent of his service. He is the family physician of the father and mother of the defendant. I cannot regard Dr. Hazelton's testimony as of great weight when compared with the records of the asylum, the opinion of its physicians, the diaries of Frederick Gray, and the fact that the brothers, at the time of executing the documents in question, had been patients in an insane hospital for nearly half a century. Frederick Gray testified himself at considerable length in this case. I have examined his testimony with care, and find in it no indication opposed to the conclusion just stated. That he was capable of carrying on ordinary conversation in an ordinary manner is quite clear, and is abundantly shown by all the testimony in the case. Some persons at Brattleboro testified that the brothers appeared upon the streets of that town and in its shops like other men, and seemed competent to make little purchases and make deposits in the savings bank like other people. Upon all this testimony I have reached the conclusion that the brothers Gray were of weak mind, that they were insane, and were proper inmates of an insane asylum, but that they were capable of understanding much that went on about them.

Although they were of unsound mind in some respects, it does not follow that every instrument executed by them can be avoided. A man may be unquestionably insane, and may have resided in an insane asylum as long as had Charles and Frederick Gray, and yet may be able to understand and validly to execute an important document. I am not prepared to say that, if the assignments here in question had been made under some circumstances, they might not be held valid in a proceeding like this.

The complainant has charged that they were obtained by the fraud and undue influence of the defendant William G. Brooks. Mr. Brooks, as has been said, was a nephew of the brothers. In 1891 he became counsel for some members of his family, including Charles and Frederick, in collecting money voted by congress to the heirs of his great-grandfather, William Gray, the well-known merchant. Partly, at least, in consequence of his efforts as counsel, a decision of the supreme court of Massachusetts adverse to his clients was reversed by the supreme court of the United States, and thereafter the decision of a single justice of the supreme court of Massachusetts was reversed by the full bench; thus increasing the amount which his clients obtained. However much I may think that the defendant has exaggerated the pecuniary value of his services, it seems plain that that value is considerable.

The defendant now contends that these assignments were made in payment of his services as counsel. There is nothing of this expressed in the assignments, which do not in terms prevent the defendant from taking his proper counsel fees from the fund, and holding the balance only in trust under the assignments; but perhaps the arrangement now suggested by him may fairly be implied from the whole series of transactions. Had this been the intention of Charles and Frederick, deliberately expressed after independent advice fully given, and after the meaning of the assignments had been fully explained to them by independent counsel altogether disinterested, I am not sure that they might not have made assignments like those in question. But, as was said in Jackson v. King, 4 Cow. 207, 219, 15 Am. Dec. 354: "In discussing this point, it is conceded that, although mere weakness of understanding is insufficient, it furnishes strong ground of suspicion that when persons in such a state execute conveyances, they are acted upon by improper influence." When the near relative and legal adviser of two weak-minded old men, residing in an insane asylum for nearly half a century, is to be benefited by their deed, the utmost openness, impartiality, and self-restraint is required from him; and when such a man seeks by his testimony, almost unsupported, concerning the explanations given to the assignors, to support the assignments, he should tell his story frankly, and without reserve.

On direct examination the defendant testified to some general conversation with Charles in 1892, and then passed at once to the summer of 1896, and the assignments here in question. On cross-examination it appeared that in 1893 the brothers executed to the defendant an assignment of these French claims. Precisely what was the form of this assignment no one but the defendant knows. Frederick was not asked about it. Indeed, his examination strongly suggests that the defendant's counsel was then ignorant of it. The defendant's testimony regarding it is not frank, or free from evasion; the paper was probably destroyed when the second assignment was executed. Not only was this first assignment made in 1893, but in January, 1896, it was sent by the defendant to the brothers, and was by them acknowledged. That it conveyed to the defendant the brothers' interest in the claims was not understood by them, as is shown by their letters of May 24, 1896. That Frederick did not understand the meaning of the assignment here in question is evident from his testimony, unless he has lost his memory,—a supposition which would make strongly against the defendant's case.

Instead of procuring for the brothers independent advice regarding the execution of these papers, the defendant, in his dealings with them, frequently urged that they should not mention these dealings to other members of the family; and his letters contain more than one erroneous statement which might well influence the brothers' minds.

It is not thus that a counselor at law can be allowed to profit by a deed made in his favor by his client. The defendant's intentions may have been good. He may have honestly believed that he had a right to act as he did; but his moral honesty will not, in a court of equity, justify his professional conduct. It is not necessary to cite cases, but these may be referred to, in all of which the solicitor's conduct was more defensible than here: Broun v. Kennedy, 4 De Gex, J. & S. 217; Rhodes v. Bate, L. R. 1 Ch. 252; Barron v. Willis, London Times, May 10, 1900, p. 16. In both these cases there must be a decree for the complainants.

Henry V. Cunningham (William G. Brooks, pro se, on the brief), for appellant.

John L. Thorndike, for appellees.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

COLT, Circuit Judge. Upon full consideration of the evidence, we have no doubt that Charles R. Gray and Frederick W. Gray, at the time they severally made the assignments to the defendant below, and

for many years previous thereto, were of weak mind, and, in consequence, the easy subjects of undue influence. Further, in conformity with the principles and decisions of courts of equity both in this country and in England, we have no question that the relation of attorney and client, under the circumstances disclosed in these cases, renders the assignments invalid. To reverse the decree in these cases, as was said in Broun v. Kennedy, "would be to unsettle the law upon a point on which the best interests of society require that it should be absolutely adhered to." 4 De Gex, J. & S. 217, 222. In our judgment, these cases are free from doubt, and we need add nothing to the clear and comprehensive opinion of the circuit court.

Decrees affirmed, and the costs of appeal are awarded in each case to the appellees.